# EXHIBIT H

William S. Klein (State Bar No. 121792)
Allonn E. Levy (State Bar No. 187251)
HOPKINS & CARLEY
A Law Corporation
The Letitia Building
70 S First Street
San Jose, CA 95113-2406

mailing address:
P.O. Box 1469
San Jose, CA 95109-1469
Telephone:  (408) 286-9800
Facsimile:  (408) 998-4790

Attorneys for Plaintiff
TIMOTHY GENS

ENDORSED FILED
SAN MATEO COUNTY

MAY 19 2005

Clerk of the Superior Court
By____M. YOUNG____
DEPUTY CLERK

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN MATEO

| | |
|---|---|
| TIMOTHY GENS,<br><br>　　　　Plaintiff,<br><br>v.<br><br>GARY FERRELL, and DOES 1-50, inclusive,<br><br>　　　　Defendants. | CASE NO. CIV 439400<br><br>**AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY, CONSTRUCTIVE AND ACTUAL FRAUD, CONVERSION, RICO, DEFAMATION, AND INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** |
| GARY FERRELL,<br><br>　　　　Cross-Complainant,<br><br>v.<br><br>TIMOTHY GENS, AND DOES 1-100, inclusive,<br><br>　　　　Cross-Defendants. | |

Plaintiff Timothy Gens alleges:

1. This is an action for fraud, breach of fiduciary duty, civil violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) [ 18 U.S.C. § 1961 et seq. ], conversion, defamation, intentional interference with prospective economic advantage, and

385\428299.1

AMENDED COMPLAINT

related claims against Gary Ferrell. As described below, Ferrell has engaged in a pattern and practice of forming business relationships with unsuspecting investors, inventors, and business professionals for the avowed purpose of developing, and commercializing new technologies, only to siphon the investments and income from the ventures to support a lavish personal lifestyle, and then to abandon the ventures and his associates, violating his fiduciary responsibilities in the process.

## SUBSTANTIVE ALLEGATIONS

### I. PARTIES AND VENUE

2. Plaintiff Timothy Gens is an individual residing in Palo Alto, Santa Clara County, California.

3. Defendant Gary Ferrell is an individual residing in San Gregario, San Mateo County, California.

4. Gens is unaware of the true names and capacities of defendants named herein as DOES 1 through 50, inclusive, and therefore sues these defendants by such fictitious names. Gens will amend this complaint to allege their true names and capacities when ascertained. Gens is informed and believes and on that basis alleges that each of the defendants is liable to Gens for the events alleged herein.

5. Gens is informed and believes and on that basis alleges that all times herein mentioned each of the defendants was the agent, service, employee or alter ego of the remaining defendants named herein and was at all times herein mentioned acting within the course and scope of said relationship and with the permission and consent of each defendants' codefendants.

6. Venue is appropriate in this county because the injury occurred here.

### II. GENERAL FACTS

7. In or about June of 1997, Plaintiff Gens was introduced to defendant Ferrell by an attorney who was working with Ferrell to help Ferrell license and market various technologies generally related to semiconductor manufacturing. Between that time and November of 1999, Gens assisted Ferrell in his various business and licensing efforts. Gens performed substantial services for Ferrell, and/or for the partnership that was created between Gens and Ferrell as

described below, without ever receiving payment for the services. The efforts to commercialize the technologies did not meet with the success that Ferrell and Gens desired, although, unbeknownst to Gens, Ferrell drew income of approximately $1 million over the time period. Some of the reasons that the commercialization efforts were not successful during this time period are described further in Section IV below (relating to the RICO claims), and involved wrongdoing by Ferrell of which Gens was unaware at the time.

8. By November of 1999, Ferrell and Gens decided to attempt to commercialize the technology by forming their own corporation to manufacture and market products, rather than licensing the technology to others. To that end, Ferrell and Gens incorporated L-Tech Corporation, a Nevada Corporation. Ferrell and Gens were the sole directors of L-Tech, and each owned 50% of the common stock. A third person, Mark Beck, invested in L-Tech and was to have received a 10% ownership interest in L-Tech in the form of preferred stock. Beck's interest was bought out in the transaction described below, wherein Gens and Ferrell sold L-Tech.

9. During 2000 and 2001, L-Tech leased facilities, hired employees and began successfully manufacturing and marketing a dryer product used in semiconductor manufacturing.

10. One of L-Tech's customers was HMR GmbH, a German company. In early 2001, HMR was acquired by SEZ Holding LTD, a Swiss company headquartered in Austria ("SEZ") SEZ was in the process of expanding its core business, which involved so-called "single wafer processing" to compete with larger companies in its field by offering "batch processing."

11. On September 11, 2001, representatives of SEZ met with representatives of L-Tech at L-Tech's facilities, and then or thereafter became interested in all of the technologies and the patent portfolio owned by L-Tech.

12. In late October, 2001, L-Tech and SEZ reached agreement on the general terms for a sale of L-Tech to SEZ.

13. After certain delays, on or about May 29, 2002, L-Tech was merged into a wholly-owned subsidiary of SEZ, SEZ America, Inc., a Delaware Corporation ("SEZ-U.S."), pursuant to a written "Agreement and Plan of Merger and Reorganization" ("the Merger Agreement"). The identified parties to the Merger Agreement were L-Tech, SEZ, SEZ-U.S., Ferrell, and Gens.

14. Under the terms of the Merger Agreement, Ferrell and Gens were to receive consideration for their interest in L-Tech that included two sets of payments (in stock) that were contingent on future sales incorporating technology that had belonged to L-Tech ("the contingent payments.") Ferrell and Gens were also retained as salaried employees of SEZ-U.S.

15. In the months following the consummation of the merger, it became increasingly clear that the business plans and operations of SEZ and SEZ-U.S. were changing and/or being carried out in such a way that would have a negative impact on the contingent payments. Gens developed the belief, and understood that Ferrell shared the belief, that SEZ and/or SEZ U.S. were in material breach of the Merger Agreement. The parties began negotiating for an amendment to the Merger Agreement that would resolve the situation, and discussed several different business models for doing so.

16. On or about October 1, 2003, the parties executed "Amendment No. 1" to the Merger Agreement.

17. On or about October 28, 2003, Ferrell admitted to Gens that during the time the amendment to the Merger Agreement was being negotiated and executed, he had separately negotiated and reached a different agreement with the SEZ entities under which he would receive more stock and/or other valuable consideration at a later time in exchange for causing Gens to agree to the less favorable terms of the amendment to the Merger Agreement. The following day, SEZ-U.S. terminated Gens' employment.

## III. ADDITIONAL FACTS GIVING RISE TO FIDUCIARY DUTIES

18. Between 1997 and 1999, Ferrell and Gens worked jointly to exploit commercially the technology at issue, each contributing, time, money, and/or other resources to the joint endeavor. During that time period, as a result of their conduct and their communications, there arose between Ferrell and Gens an express and/or implied understanding and agreement of a partnership, and that they would share in the profits and losses of their venture.

19. At the time L-Tech was formed, Ferrell and Gens understood and agreed expressly and/or impliedly that L-Tech would serve as the primary vehicle through which they would continue their prior efforts, but that to the extent that any technologies or intellectual property

rights then existed or thereafter arose which related to or grew out of their preceding efforts were not assigned to or did not become the property of L-Tech, the partnership relationship would continue to exist with respect to such technologies or intellectual property rights, and the partnership could and would commercialize and profit from such technologies and rights through such other entities or forms of doing business jointly as might prove appropriate.

20. At all times during the existence of L-Tech, Gens and Ferrell held mutual fiduciary duties towards each other as the sole directors and equal shareholders of the common stock.

21. After the sale of L-Tech to the SEZ entities, and pursuant to their prior and ongoing partnership relationship, Gens and Ferrell developed a new and novel technology for cleaning wafers ("the cleaning technology"). Gens and Ferrell are listed as co-inventors on a patent application related to the cleaning technology. the cleaning technology was *not* an asset of L-Tech that was transferred to SEZ-U.S. under the Merger Agreement (as the technology did not exist at the time). Gens is informed and believes, and on that basis alleges, that Ferrell has obtained additional compensation from the SEZ entities for the cleaning technology.

22. After the sale of L-Tech to the SEZ entities, and pursuant to their prior and ongoing partnership relationship, Gens and Ferrell negotiated with the SEZ entities for a license to certain older technology for drying wafers ("the drying technology") that had belonged to L-Tech prior to the merger. Gens and Ferrell intended jointly to exploit the drying technology through their partnership or such other entity as they might form for that purpose. Gens is informed and believes, and on that basis alleges, that Ferrell has now obtained, or is now attempting to obtain a licensee or licensees of the drying technology on his own behalf.

23. At the time Gens came to believe that the SEZ entities were in material breach of the Merger Agreement, Ferrell impliedly and/or expressly authorized Gens to negotiate with the SEZ entities on behalf of Ferrell and Gens jointly for an amendment to the Merger Agreement.

24. Although L-Tech's corporate existence legally ceased upon consummation of the merger, *all* of the remaining parties to the Merger Agreement recognized and acknowledged that there continued to exist joint rights, powers, and obligations, in an inchoate form, or in the ongoing Ferrell-Gens partnership relationship, or otherwise, but that related to and arose from the

prior existence of L-Tech. As evidence of that recognition, the parties negotiated and executed an *amendment* to the original Merger Agreement (as opposed to one or more agreements that simply resolved the disputes or changed the remaining obligations between the SEZ entities and Ferrell and/or Gens as individuals). Additionally, that amendment expressly required Ferrell and Gens to execute a release in favor of the SEZ entities of any claims arising out of their status as prior shareholders of L-Tech—i.e., *not* just claims arising from Ferrell and Gens' *individual* rights under the Merger Agreement.

## IV. ADDITIONAL FACTS SUPPORTING CLAIMS UNDER RICO

25. In addition to the course of conduct alleged above, Ferrell has engaged in a pattern and practice of committing deception and fraud in connection with luring investors into his business ventures, siphoning income therefrom, but failing to honor his commitments and promises, and ultimately abandoning his associates. Four such "episodes" are set forth in more detail below.

26. In EPISODE 1, Ferrell formed Sawtooth Sciences with Frank Rushford, a licensed attorney who practices patent law. Sawtooth was to have been incorporated, but it never issued shares to Rushford or any other subsequent investors who were promised shares; its legal status is unknown to Gens. Gens is informed and believes, and on that basis alleges that during the course of Sawtooth's business, over a period of three years, Ferrell took compensation from the business of approximately $1 million, while Rushford received nothing.

27. Through Sawtooth, Ferrell entered into a working relationship with Caltek Sales, a company owned by Dean Bettcher located in Santa Clara, California to design and build new products in the semiconductor equipment processing industry. Gens is informed and believes, and on that basis alleges Caltek paid Ferrell over $122,000 in a year to consult.

28. Through his relationship with Caltek, Ferrell became aware of Bettcher Process Systems (BPS), a manufacturer of semiconductor equipment owned by Gary and Galen Bettcher in Santa Clara, California. Dean Bettcher, owner of Caltek, conceived of the idea to have Ferrell/Rushford buy BPS on an installment contract.

29. Ferrell and Rushford thereupon formed BPS Wet System (BPSWS) for the purpose of buying BPS. After soliciting investors (such as Dale Ann Springer, *et al.*) and promising them stock, shortly before the transaction was to close, Ferrell abandoned the venture, and failed and refused to assign the intellectual property rights at issue as promised.

30. In EPISODE 2, unbeknownst to his associates of Episode 1, Ferrell negotiated a licensing agreement for certain Sawtooth Technology with All In One Microsystems ("AIO"), a semiconductor equipment manufacturer located in Fremont, California.

31. Gens is informed and believes, and on that basis alleges that approximately one month after the Episode 1 transaction was supposed to close, Ferrell received $50,000 and at least $10,000 per month thereafter under the AIO license for backing out of the Episode 1 transaction. The following year, Ferrell received an additional upfront payment of $250,000 from AIO for the right to sublicense the technology to a company in Korea. Ferrell then abandoned his performance under the consulting agreement he had with AIO.

32. In EPISODE 3, Ferrell formed another new company, Sonophysical Sciences, after he abandoned his Episode 1 and 2 associates.

33. Gens is informed and believes, and on that basis alleges that Ferrell formed Sonophysical to develop a raw idea of his for a technology that could compete with Sawtooth technology at issue in the previous episodes. Developing the idea required a lot of work from a skilled engineer even to build a prototype to test functionality of the idea. To that end, Ferrell solicited Robert Elson, Stanford engineer living in Palo Alto, who as in the case of Ferrell's prior associates, was never paid for his services. Ferrell promised Elson stock in Sonophysical Sciences, but failed and refused ever to issue it.

34. In EPISODE 4, Ferrell persuaded an attorney, Jay Kajimura, to assist him in gathering a number of additional investors and professional to commercialize various technologies through Sonophysical Sciences. Gens is informed and believes, and on that basis alleges that as in the prior instances, Ferrell personally made approximately $1M over a 2-3 year period, yet the professionals were never paid for their services (except for one nominal payment to Kajimura) in cash or in promised stock, and the investors were never issued stock as promised.

Ferrell reneged on all promises and eventually abandoned Kajimura and all of the other associates.

## V. ADDITIONAL FACTS SUPPORTING CONVERSION RELATED CLAIMS

35. As alleged above, Ferrell and Gens are co-owners of certain intellectual property rights in the older drying technology that was not part of what the SEZ entities acquired in the Merger Agreement as well as the cleaning technology developed after the Merger Agreement took effect and as to which the SEZ entities did not otherwise obtain rights through the agreements or legal relationships among the parties. Gens is informed and believes, and on that basis alleges that Ferrell has subsequently converted said intellectual property to his own use by entering into agreements to exploit it commercially to his own profit and to the exclusion of Gens.

36. Additionally, Gens has learned that following Gens' departure from SEZ in or about March of 2004, Mr. Ferrell engaged the services of a forensic computer consultant to "hack" an SEZ computer previously utilized by a former SEZ employee, Mr. Jay Ratra (hereinafter the "Ratra Computer"). Having hacked the Ratra Computer, Mr. Ferrell obtained images of certain diagrams which had been created by Mr. Gens and others following Mr. Gens' departure from SEZ. These diagrams were created independently of SEZ, were not created utilizing SEZ equipment, and were only temporarily stored on the Ratra Computer in a manner that was intended to be secure. Although Mr. Ratra took steps to remove the proprietary diagrams from the Ratra Computer prior to his voluntary departure from SEZ, Mr. Ferrell successfully hacked into the Ratra Computer and obtained said diagrams and drawings.

37. Having obtained said diagrams and drawings, Mr. Ferrell caused a patent application to be filed with the U.S. Patent and Trademark Office that included the diagrams and information he had obtained from the Ratra Computer (hereinafter the "Nebulizer Patent"). Mr. Ferrell was listed as the inventor of the Nebulizer Patent invention on documents filed with the U.S. Patent and Trademark Office. In fact, Mr. Ferrell was not the inventor of said product but rather, had misappropriated same from Mr. Gens.

## VI. ADDITIONAL FACTS SUPPORTING DEFAMATION CLAIMS

38. Gens is informed and believes, and on that basis alleges that beginning at or about

the time that Ferrell conceived of his plan to negotiate a separate agreement on his own behalf with the SEZ entities, and continuing thereafter, Ferrell embarked on a campaign of defamation against Gens, in which he made disparaging and untrue statements regarding Gens' honesty, integrity, and competency to representatives of the SEZ entities and to others in the industry. Gens is informed and believes, and on that basis alleges, that the instances of defamation include, but are not limited to the following:

39. In December 2003, Ferrell invited Jim Lopes, an ex-L-Tech/SEZ employee who was a Director of Sales and Marketing, to lunch in Palo Alto. During the luncheon Ferrell explicitly and falsely stated, in these words or words to similar effect, that Gens "engaged in criminal activity," "repeatedly exhibited criminal behavior," "nearly had him (Ferrell) and his wife thrown in jail because of his (Gens') criminal acts," and "had an evil side no one knew about." Ferrell also warned Lopes "not to deal with Gens." This defamation was intended by Ferrell to prevent Lopes from ever starting another venture with Gens. Lopes has a vast knowledge of sales and marketing in the Semiconductor and medical device industries and was also a known quantity to Gens. Depriving Gens access to Lopes would adversely affect Gens' ability to launch any new venture.

40. In late November, 2003, Ferrell was working with an SEZ Employee Engineer named Wayne Goodspeed at the California Research Center of SEZ in Mountain View. During a series of conversations during work hours, Ferrell falsely told Goodspeed, in these words or words to similar effects, that Gens "engaged in criminal activities," "could have had us thrown in jail by criminal acts," Ferrell also warned Goodspeed "not to deal with Gens."

41. In December, 2003 and January, 2004, Ferrell was working with an SEZ Employee Chief Engineer Jay Ratra at the California Research Center of SEZ in Mountain View. During a series of conversations during work hours, Ferrell made the same or similar false statements to as he made to Goodspeed. Gens is informed and believes, and on that basis alleges, Ferrell made similar false statements about Gens to other SEZ employees at the SEZ facility in Phoenix by telephone.

42. Gens made similar false statements to Terry Smith, a former L-Tech/SEZ

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE

385\428299.1         - 9 -

AMENDED COMPLAINT

representative; to Mike Buchin, owner of Stanford Photonics in Palo Alto, a vendor; to James Bushong, of Expedite Inc, another vendor in Sunnyvale; and to various research associates with whom Gens had collaborated in the past, including Dr. Crum, head of the Physics Department at the University of Washington.

## FIRST CAUSE OF ACTION
## (BREACH OF FIDUCIARY DUTY)

43.   Plaintiff realleges and incorporates herein by this reference as if the same were fully set forth at this point, the allegations of paragraphs 1 through 42, inclusive.

44.   By virtue of the facts alleged above, Ferrell had fiduciary duties towards Gens, including, but not limited to, the duty to refrain from negotiating a separate and different deal with the SEZ entities, or at a minimum, to disclose to Gens any such attempt to negotiate a separate deal and to refrain from misleading Gens into believing that Ferrell was acting jointly with Gens with respect to negotiating Amendment No. 1 to the Merger Agreement, and that Amendment No. 1 was the only agreement being negotiated and formed among the parties. Ferrell's fiduciary duties further included the duty not to convert for his own use and to the exclusion of Gens the intellectual property rights they jointly held notwithstanding the Merger Agreement and not to convert or otherwise misappropriate Gens' inventions.

45.   In acting as alleged above, Ferrell breached his fiduciary duties towards Gens, resulting in actual damages to Gens in an amount to be proven at trial.

46.   As demonstrated by the course of conduct alleged above, Ferrell acted with fraud, oppression, and malice, warranting the imposition of punitive damages in an amount to be proven at trial.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as set forth below.

## SECOND CAUSE OF ACTION
## (CONSTRUCTIVE AND ACTUAL FRAUD)

47.   Plaintiff realleges and incorporates herein by this reference as if the same were fully set forth at this point, the allegations of paragraphs 1 through 42, inclusive.

48.  By virtue of the conduct alleged above, Ferrell committed constructive fraud against Gens, including but not limited to by failing to disclose the existence of his separate negotiations with the SEZ entities, resulting in actual damages to Gens in an amount to be proven at trial.

49.  As alleged above, Ferrell expressly and impliedly represented to Gens that he was acting jointly with Gens when he agreed to execute Amendment No. 1 to the Merger Agreement. Ferrell thereby impliedly represented, among other things, that he was *not* engaged in negotiating a different and separate deal.

50.  Ferrell's representations were false, as alleged above.

51.  Gens reasonably relied on Ferrell's representations to his detriment, in that he executed Amendment No. 1 to the Merger Agreement without knowledge that it did not represent the complete and true arrangements and understandings among the parties, resulting in actual damages to Gens in an amount to be proven at trial.

52.  As demonstrated by the course of conduct alleged above, Ferrell acted with fraud, oppression, and malice, warranting the imposition of punitive damages in an amount to be proven at trial.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as set forth below.

### THIRD CAUSE OF ACTION
### (CONVERSION)

53.  Plaintiff realleges and incorporates herein by this reference as if the same were fully set forth at this point, the allegations of paragraphs 1 through 42, inclusive.

54.  In acting as alleged above, Ferrell converted to his own use and enjoyment, and to the exclusion of Gens, and/or prevented Gens from having access to, and/or destroyed, the intellectual property of the drying technology, the cleaning technology that Gens jointly owned and had the right to possess, use, and profit from, and the Nebulizer Patent which Gens owned and had the right to possess, use, and profit from, all resulting in actual damages to Gens in an amount to be proven at trial.

55.     As demonstrated by the course of conduct alleged above, Ferrell acted with fraud, oppression, and malice, warranting the imposition of punitive damages in an amount to be proven at trial.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as set forth below.

### FOURTH CAUSE OF ACTION
### (RICO)

56.     Plaintiff realleges and incorporates herein by this reference as if the same were fully set forth at this point, the allegations of paragraphs 1 through 55, inclusive.

57.     In acting as alleged above, Ferrell violated the Racketeer Influenced and Corrupt Organizations Act (RICO) [ 18 U.S.C. § 1961 et seq. ] to Gens' detriment and damage, entitling Gens to the statutory remedies, including treble damages and attorneys' fees.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as set forth below.

### FIFTH CAUSE OF ACTION
### (DEFAMATION)

58.     Plaintiff realleges and incorporates herein by this reference as if the same were fully set forth at this point, the allegations of paragraphs 1 through 42, inclusive.

59.     As alleged above, Ferrell has engaged in an ongoing course of defamation against Gens, publishing false and disparaging statements that tend to injure Gens in his profession and business because, among other things, they impute to him dishonesty and incompetence.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as set forth below.

### SIXTH CAUSE OF ACTION
### (INTENTIONAL INTERFERENCE WITH
### PROSPECTIVE ECONOMIC ADVANTAGE)

60.     Plaintiff realleges and incorporates herein by this reference as if the same were fully set forth at this point, the allegations of paragraphs 1 through 42, inclusive.

61.     Gens had expected to accrue further benefits in the future based upon his expected

continued relationships with clients, leads, businesses, scientists and professionals, which contacts were reasonably certain to continue indefinitely.

62. Economic relationships also existed between Gens and prospective new clients with a reasonable likelihood of probable future economic benefit to Gens.

63. Ferrell knew or should have known of these prospective economic benefits to Gens.

64. Ferrell intentionally and recklessly took steps to disrupt these prospective economic relationships.

65. The acts complained of were independently wrongful in that they violated *inter alia*, California Business and Professions Code section 17200 *et seq.*, California Civil Code sections 3426 *et seq.*, Ferrell's fiduciary duties owed to Gens, the RICO statutes set forth above, and in that the acts amounted to common law conversion or theft, defamation, misrepresentation and the filing of false and perjurious statements with the U.S. Patent and Trademark Office.

66. In performing the acts described above, Ferrell intentionally and recklessly committed acts that unlawfully interfered with Gens' prospective economic advantage, including but not limited to, acts designed to induce some of Gens' clients and prospective clients to cease to do business with him.

67. In performing the acts described above, Ferrell actually interfered with Gens' economic relationships with some or all of Gens' actual or prospective clients, leads, or other contacts.

68. In performing the acts described above, Ferrell intended to and did benefit and proximately caused Gens to suffer substantial economic harm, in an amount to be proven at trial.

69. The aforementioned acts of Ferrell were willful, oppressive, fraudulent and malicious. Gens is therefore entitled to punitive damages.

WHEREFORE, plaintiff prays for judgment against defendants, and each of them, as set forth below.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

1. For actual damages in an amount to be proven at trial,

2. For punitive damages in an amount to be proven at trial,

3. For such statutory relief, including treble damages and attorneys' fees as provided by the Racketeer Influenced and Corrupt Organizations Act (RICO) [ 18 U.S.C. § 1961 et seq. ].

4. For costs of suit, and,

5. For such other and further relief as the Court may deem just and proper.

Dated: May 19, 2005

HOPKINS & CARLEY
A Law Corporation

By: _____
Allonn E. Levy
Attorneys for Plaintiff
TIMOTHY GENS

**PROOF OF SERVICE BY OVERNIGHT DELIVERY**

I am a citizen of the United States and employed in Santa Clara County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is The Letitia Building, 70 S First Street, San Jose, California 95113-2406. On May 19, 2005, I deposited with United Parcel Service, a true and correct copy of the within documents:

AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY, CONSTRUCTIVE AND ACTUAL FRAUD, CONVERSION, RICO, DEFAMATION, AND INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

in a sealed envelope, addressed as follows:

Merrill Emerick
Anderlini, Finkelstein, Emerick & Smoot
400 So. El Camino Real, Suite 700
San Mateo, CA  94402Address

Following ordinary business practices, the envelope was sealed and placed for collection by United Parcel Service on this date, and would, in the ordinary course of business, be retrieved by United Parcel Service for overnight delivery on this date.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on May 19, 2005, at San Jose, California.

*/s/ Annette S. Estupinian*
Annette S. Estupinian

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE

AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY, CONSTRUCTIVE AND ACTUAL FRAUD, CONVERSION, RICO, DEFAMATION, AND INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE